**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| **AMANDA TIMPSON,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.:** |
| | ) | |
| **FULTON COUNTY DISTRICT ATTORNEY'S OFFICE, and FANI WILLIS, in her individual capacity as Fulton County DA,** | ) ) ) ) | |
| | ) | |
| *Defendants.* | ) | |

## COMPLAINT

Plaintiff, Amanda Timpson, files this Complaint against Defendant Fulton County District Attorney's Office and Fani Willis, in her individual capacity as Fulton County DA, using state laws and 42 U.S.C. § 1983 to bring claims against the Defendant pursuant to Equal Protection under the Fourteenth Amendment of the United States Constitution; breach of contract; negligence; and gross negligence.

## INTRODUCTION

"It [has been] self-evident, also, since the officer must justify his action, if at all, by showing that he was authorized of law so to act, that if he commits an act which his authority will not justify, or if he exceeds, ignores, or disregards the limits set on his authority, he cannot then justify at all, **but must respond to the party injured like any other wrongdoer**."

[Floyd Russell Mechem, A Treatise on the Law of Public Offices and Officers, § 663 (Callaghan and Company, 1890)]

## JURSIDICTION AND VENUE

1.

Jurisdiction is proper as this Court has subject matter jurisdiction of the federal claims asserted in this action under 28 U.S.C. §§ 1331 and 1343(a)(4), and 42 U.S.C. § 1983.

2.

This Court has authority to award costs and attorneys' fees under 42 U.S.C. § 1988.

3.

Venue is proper under 28 U.S.C. § 1391(b) and L.R. 3.1(B)(3) because (1) a substantial part of the events and omissions giving rise to Ms. Timpson's' claims occurred within this District and Division and (2) Defendant resides and transacts business in this District and Division.

## PARTIES

4.

**Plaintiff, Amanda Timpson,** is an African American adult female employed by the Fulton County District Attorney's Office. At all times relevant to this Complaint, Ms. Timpson was a citizen of the United States and a resident of Georgia. At all times relevant to this Complaint, Ms. Timpson had clearly established legal rights

under state and federal law and the United States Constitution, such as the right to be free from discrimination and to enjoy equal protection of the law of this country. Ms. Timpson submits herself to the jurisdiction and venue of this Court and is entitled to bring this action under state and federal law for all general, special, and any other permissible damages.

5.

**Defendant, Fani Willis**, at all times relevant, is the District Attorney of Fulton County, a citizen of the United States, and a resident of Georgia. At all times relevant, Willis was acting under color of state law when she engaged in discrimination and retaliation towards Ms. Timpson, as well as when she created a hostile work environment for Ms. Timpson. At all times relevant, Willis was governed by strict policies that prohibited her actions towards Ms. Timpson.

6.

**Defendant, Fulton County District Attorney's Office,** at all times relevant

## STATEMENT OF FACTS

**A.      Ms. Timpson's early life and life-long dedication to, and dream of, working with at-risk youth**.

7.

Born in Michigan, year 1986, Ms. Timpson moved to southern California by the time she was six months old.

8.

Separated from her mother at birth, Ms. Timpson was raised in the foster care system and was ultimately, adopted by traditionalist, Mormon parents who did both foster care and emergency shelter for Riverside, County California. She stayed with her adopted parents until the age 16; at that point, due to traumatic experiences, she was on her own.

9.

Despite a traumatic early life, Ms. Timpson graduated high school one year early.

10.

After graduating high school, Ms. Timpson found her mother, to establish a relationship, while entering cosmetology and barber school and after graduating from that program, she styled her for about five years.

11.

While styling hair, Ms. Timpson got pregnant at the age 20, and became a single mother, working full-time styling hair and being a street outreach worker for an organization called Gang Reduction and Youth Development (GRYD).

12.

Ms. Timpson entered junior college while pregnant, seeking greater opportunities for herself and her child; she quickly transferred riverside community

college, where she obtained her associate degree in social and behavioral science.

13.

After obtaining her associated degree, Ms. Timpson and her son moved to Atlanta, GA, where she attended Georgia State and received a dual bachelor's degree in Africana Studies and Sociology—while working full time.

14.

After graduating from Georgia State University, Ms. Timpson got a job back in California with the Youth Justice Coalition, as a case manager, helping at risk youth who were also serving criminal sentences—she did this for about two years.

15.

While in California working, Ms. Timpson obtained her both master's degree in Human Behavior and Post Masters Specialty Certificate in adolescent advocacy.

16.

Ms. Timpson had a mentor who was a professor at Georgia State University, and this mentor extended an opportunity to Ms. Timpson that fell in line with her work with at risk youth. So, Ms. Timpson moved back to Atlanta, where she began to work with Chris 180, an organization dedicated to improving the mental and emotional health of at-risk youth who suffered from PTSD, abuse, neglect, and other forms of environmental trauma.

17.

Ms. Timpson moved into education, teaching in the Atlanta Public School
District at Price Middle School and Best Academy.

**B.    Ms. Timpson begins to work at the Fulton County District
Attorney's Office in 2018**

18.

In 2018, having obtained her advanced degrees and with years of youth
advocacy experiences to rely on, Ms. Timpson applied for and obtained the position
of Director of Gang Prevention and Intervention with the Fulton County District
Attorney's Office, under former District Attorney, Paul Howard.

19.

In this role as Director of Gang Prevention and Intervention, Ms. Timpson
trained APS Law Enforcement officer, school leadership and counselors on gang
trends; she also created "parent university' to bring awareness to parents about gang
trends and youth. Ms. Timpson also led a Capitol Campaign and engaged in so many
countless efforts in the name of preventing youth violence and healing trauma
experienced by youths.

20.

Significantly, Ms. Timpson also helped author the grant application for the
2020 Office of Juvenile Justice and Delinquency Program and Gang Prevention
Grant (OJJDP), **an experience that gave her direct insight how monies awarded**

**under that must be spent**.

21.

Ms. Timpson stayed in that position for two years until Ms. Fani Willis became the Fulton County District Attorney.

**C.   Ms. Timpson is elected by DA Willis's Special Integrity Transition Hiring Committee to the position of Program Manager/Direct of Juvenile Diversion**

22.

During the transition of the District Attorney from Paul Howard to current District Attorneys, Fani Willis—DA Willis established the Special Integrity Transition Hiring Committee (SITHC), which was a 9-member panel (which included DA Willis) charged with selecting certain high-level/executive positions within DA Willis staff.

23.

After extensively interviewing with DA Willis and the other 8 members of the SITCH, the SITCH selected Ms. Timpson to be the Program Manager/Director of Juvenile Diversion under DA Willis incoming administration' notably over 400 applicants were interviewed for a variety of positions by the members of the SITCH.

24.

Ms. Timpson received several congratulatory emails stating that she had been selected to join the 2021-2024 administrations executive leadership team. (See Ex. 1.)

**D.    Ms. Timpson's work ethic garners multiple support letters.**

25.

Ms. Timpson's time at the district attorney's office garnered her multiple support letters, demonstrating her excellent ability to work within a team setting. For example, attached to this Complaint are support letters from Charles Prescott, Chief Investigator of Cobb County, remarking that "**Ms. Timpson's sociological and programmatic understanding for the populations she has dedicated her life's work to is what sets her apart from so many with which I have led**," and from Dr. Maurice Granger, Head of School Discipline for APS, remarking that "**it is a pleasure working with Ms. Timpson. Her work ethic, passion, resourcefulness, and ability to bring programmatic ideals to tangible fruition are some of her greatest qualities**," and from Lieutenant Tealer, Administrative lieutenant for Special Operations Division, for South Fulton Police remarking that "**Ms. Timpson's ability to work alongside several opinions on the topic of gangs has not only led to reshaping our understanding of the impacts of gangs within the communities but also aided in helping to create a solid program that will positively impact the lives of all participants and their families**," and from Natalie Zellner, Fulton County's Deputy District Attorney of Programs, Grants, and inter-governmental relations, remaking that "**This letter of recommendation is for Amanda Timpson, who has great knowledge of juvenile and anti-gang**

**programming to dissuade recidivism. Her leadership was a critical component in securing the 2020 OJJDP Comprehensive Anti-Gang Programming Grant for more than $400,000 for the Office of the Fulton County District Attorneys**." (See Ex. 2.) Zellner wrote her a letter of recommendation after apologizing to Ms. Timpson on the afternoon of Dec 9, 2021, because she, Ms. Zellner, felt as if she was "used as a pawn" in the administration's retaliation against Ms. Timpson. And asked Ms. Timpson if there was anything she could do to redeem herself and offered to write Ms. Timpson a letter of recommendation in her, Ms. Zellner's new elevated role.

26.

In all, attached to this Complaint are twelve letters of recommendation spanning from persons currently working at the District Attorney's Office—under DA Willis-- currently such as Natalie Zellner, Kelly Greenberg, Mike Makins to APS leadership and high-ranking Law enforcement officials, to other organizations such as the Chris 180 and the King Center—all of which demonstrate Ms. Timpson knowledge, experience, commitment, and just as important ability to work professionally and peacefully with a broad range of dynamic personalities to achieve stated goals. (See Ex. 2.)

27.

Ms. Timpson has shown an unmistakable ability to work in team setting extremely well to accomplish goals, so the issue then becomes, why after being selected by the Willis Administration, and fulfilling her job duties in a manner that has garnered excellent recommendations (see Ex. 2)—did the Willis administration choose to fire her citing her employment at will status as the sole reason. (See Ex. 3, for separation notice and termination letter.)

**E.    Ms. Timpson blows the whistle on one of Willis' trusted members of her "dignitary team"**

28.

Michael Cuffee was the Chief Deputy Director of Programs and served as Ms. Timpson's direct report/supervisor while she held the position of Director of Juvenile Diversion.

29.

In March 2021, there was a meeting between Mr. Cuffee, Ms. Timpson, and Ian Elmore- Moore and during that meeting they discussed the OJJDP Grant and its scope; they discussed (1) the possibility of establishing a mac computer lab (Purchasing approximately 24 Mac computers); (2) travel in terms of obtaining additional certification by using OJJDP money to send programs division staff to conferences and other places to obtain said certifications; and "office swag" i.e., t-shirts, books bags, and other paraphernalia for the Program employees he supervised.

30.

During the referenced March 2021 conversation between Cuffee, Ms. Timpson, and Moore, Ms. Timpson—as the principal person who wrote and secured the OJJDP Grant (see Ex. 3)—told Cuffee that he could not spend OJJDP grant money in the manner he was contemplating because it would be tantamount to a misappropriation of funds. Mr. Cuffee responded by stating he would talk to "Madame" (DA Willis) about the issue as he stated he knew her vision.

31.

Ms. Timpson followed her warning about misusing OJJDP funds with a follow-up conversation with Cuffee about the matter in early April 2021, a conversation in which Ms. Timpson told Mr. Cuffee—yet again—after Cuffee yet again discussed spending OJJDP funds on computers, that he simply cannot leave room in the OJJDP budget to purchase computers because OJJDP funds cannot be spent in that manner.

32.

The reason Mr. Cuffee kept pushing the idea of spending OJJDP funds on computers is because Mr. Cuffee knew that Mr. Timpson's job role encompassed the ability to influence the manner in which OJJDP funds were spent, because she was a co-author of the grant and had strong relationship with the Grantor, OJJDP.

33.

Immediately after warning Mr. Cuffee on two separate occasions that OJJDP funds simply could not be utilized in the manner he had been contemplating, Mr. Cuffee began to derail Ms. Timpson's ability to move forward with her strategic plan for implementing a juvenile diversion program for Fulton County, a program that was the very purpose of the OJJDP funds.

34.

In terms of derailing Ms. Timpson's ability to move forward with her strategic plan for implementing a juvenile diversion program for Fulton County, Mr. Cuffee had previously emphasized the job requirement of Ms. Timpson creating and presenting a said strategic plan to DA Willis; however, after admonishing Cuffee about his contemplated unlawful use of OJJDP funds, Cuffee voided the creation and presentation of the strategic plan to DA Willis, and stonewalled Ms. Timpson's progress an act that made it appear as if Ms. Timpson did not fulfill an important job duty related to the proper execution of OJJDP Grant.

35.

Immediately after warning Mr. Cuffee on two separate occasions that OJJDP funds simply could not be utilized in the manner he had been contemplating, Mr. Cuffee  stopped inviting Ms. Timpson to Program leadership meetings and events of which she clearly should have been present—as Director of Juvenile Diversion-- in

order to properly perform her job duties; Cuffee also stopped doing individual weekly meetings with Ms. Timpson—a reality that also had as its aim of hindering her from performing her job duties.

36.

Immediately after warning Mr. Cuffee on two separate occasions that OJJDP funds simply could not be utilized in the manner he had been contemplating, Mr. Cuffee began to distance Ms. Timpson from participating in OJJDP grant planning activities by assigning her to a completely different Program, Junior DA Program—mindful that Ms. Timpson's participation on the OJJDP Grant was mandatory because she was expressly written into the Grant. But as you will read, Ms. Timpson reported misuse of funds within the Junior DA Program.

**F.      After Cuffee assigns Ms. Timpson to a completely different Program, the Junior DA Program, Ms. Timpson blows the whistle on misuse of Junior DA funds**.

37.

Shortly after warning Mr. Cuffee on two separate occasions that OJJDP funds simply could not be utilized in the manner he had been contemplating—and just one day after Ms. Timpson sent Mr. Cuffee an email complaining about him essentially stopping her from performing her job duties, including the creation and presentation of a strategic implementation plan to DA Willis--Mr. Cuffee (on May 4, 2021) assigned Ms. Timpson to an entirely different Program, the Junior DA program. Ms. Timpson. Note, Ms. Timpson sent Ms. Willis an email the previous day making her

aware she had followed the "chain of command to no avail" and needed to speak to her regarding both her progress as well as concerns she had with her supervisor. (See Ex. 16).

38.

Ms. Timpson's role was the same, Program Director, regarding the Junior DA Program

39.

The Junior DA Program is a summer program which mandates that all participants be both a Fulton County Resident and attending a Fulton County School or Atlanta Public School. (See Ex. 4 for copy of eligibility requirements.)

40.

After becoming the Program Director of the Junior DA Program, Cuffee approached Ms. Timpson about using funds from the Junior DA Program to buy an apple iMac computer and once again, Ms. Timpson told Cuffee that just like with OJJDP funds, he could simply not use Junior DA program funds to buy himself an office computer; Cuffee responded by immediately removing Ms. Timpson as Director from the Junior DA Program. This all occurred within one week's time in May 2021.

41.

Within a couple of weeks of immediately removing Ms. Timpson from the Junior DA Program, Mr. Cuffee placed Ms. Timpson on a Professional Development Plan.

**G.    By Happenstance Ms. Timpson finally meets DA Willis, who is so impressed by her that she expands her role as Director to work with other significant programs with the office of district attorney**

42.

Back in her role, as Director of Juvenile Diversion, in June 2021, Ms. Timpson was invited to a meeting *sua sponte*, unbeknownst to Mr. Cuffee, by a high-ranking Deputy Director of the SB440 unit who after meeting with Ms. Timpson on a separate project felt she should attend the meeting to present information the two of them had discussed. DA Willis was the host of this meeting, Mr. Cuffee was not in attendance, and Ms. Timpson was given the opportunity to finally present her strategic plan to DA Willis, the strategic plan that Cuffee had shut down. DA Willis loved the plan so much that she assigned Ms. Timpson to work with this new division on the plan's execution, further expanding her role and duties as Director to both Juvenile diversion as well as SB440.

43.

In her expanded role, Ms. Timpson begins by working with six different schools within APS to execute a new program directive at the direction of DA Willis, but this never happened because Mr. Cuffee further retaliated against Ms. Timpson.

**H.     Cuffee puts Ms. Timpson on PDP but literally never meets with her and never provides any feedback according to the PDP**

44.

Significantly, the day after said presentation to Ms. Willis, Cuffee is notified by Ms. Timpson of the meeting and the directives given in said meeting (to which he was not invited) Cuffee responded by officially putting Ms. Timpson on a Professional Development Plan (PDP) immediately thereafter.

45.

Foremost, in the PDP meeting, Cuffee demonstrates ethnic and racial animus towards Ms. Timpson's natural hair style that is well groomed and professional by saying her natural hair was unprofessional, elementary and came across as unclean and unkept; Cuffee had also insinuated that Ms. Timpson had gang tattoos (which she does not).

46.

That established, for the entire time Ms. Timpson was on this alleged PDP, Cuffee never met with Ms. Timpson to discuss plan details or provide feedback.

**I.     The Junior DA Program begins and Ms. Timpson alerts Cuffee to the program operating out of Compliance**

47.

When Cuffee first placed Ms. Timpson as director of the Junior DA Program and then removed her, the Program was in its planning stages, and once Ms. Timpson was removed as director, she still remained involved in a chaperone capacity because

everyone in the Programs Department served as a chaperone.

48.

The Junior DA Program actually began in July 2021—after Ms. Timpson was removed as its director—but as a chaperone, Ms. Timpson noticed that some program participants did not meet the program requirement of both being a Fulton County resident and attending a school with the Atlanta Public Schools system.

49.

Because Ms. Timpson noticed that some Junior DA Program Participants did not meet the program requirement of both being a Fulton County resident and attending a school within the Atlanta Public Schools system—she told Cuffee that the program was in noncompliance because participants were not meeting the program participation requirements. Cuffee responded by just staring at Ms. Timpson and walked away. (See Ex. 4).

**J.**   **After Reporting Non-Compliance to Cuffee regarding the Junior DA Program, Ms. Timpson met with the HR Director for the Fulton County District Attorney's Office and discloses noncompliance and other several other issues**

50.

Foremost, the Director of Human Resources for the District Attorney's Office, Kyra Banks, reports directly to DA Fani Willis, who has absolute control of all significant aspect of Ms. Banks employment including termination.

51.

On July 20, 2021 at 2 pm., while on her PDP, Ms. Timpson met with Ms. Banks and in that meeting she told Ms. Banks in pertinent part that (1) The Junior DA Grant was out of compliance because it was permitting participants who did not meet the grant-funding requirements (e.g., permitting people to participate who were not Fulton County residents and who did not attend school within the Atlanta Public School system such as participants who lived and attended school out of state); and (2) Cuffee was attempting to mis use OJJDP funds by purchasing items prohibited by funding requirements.

52.

During the subject meeting with Ms. Banks, Ms. Timpson noticed that Ms. Banks was taking notes about the issues discussed in the meeting; Consequently, after the meeting, Ms. Timpson made multiple requests for the notes, but Ms. Banks refused. (See Ex. 5.)

**K.    While on her PDP, and after her meeting with Ms. Banks, Ms. Timpson tells Cuffee that the Junior DA Program is not complying with rules, and Cuffee responds by telling everyone he is going to terminate Ms. Timpson's employment**

53.

About a week into her PDP, Ms. Timpson tells Mr. Cuffee that the Junior DA Program is out of compliance because there are students that do not live in Fulton County and attend an Atlanta Public School, which are the two mandated criteria for

participating in the Junior DA Program in fact, the Junior DA Program was permitting children who both lived out of state and attending school out of state to participate, and this simply was not the target demographic for the funding. Mr. Cuffee just looked into Ms. Timpson's face and walked away.

54.

About two weeks after first informing Mr. Cuffee that the Junior DA Program was out of compliance because children, who did not meet the mandated criteria, were participating in the Program—Ms. Timpson told Mr. Cuffee again that the Program was out of compliance and discussed as an example, a child participant who lived in Wisconsin and attended a Wisconsin school as similarly, a child participant who lived in Florida and attended a Florida School. Mr. Cuffee again responded by simply staring Ms. Timpson in the face and walking away—but then things got even worse for Ms. Timpson, who Cuffee had already put on the PDP.

55.

On the same day of Ms. Timpson's second time informing Mr. Cuffee that the Junior DA Program was operating out of compliance, and Mr. Cuffee walking away from Ms. Timpson, Cuffee began telling Ms. Timpson's colleagues "I am going to fire that bitch," and "She's outta here," and "I already got a temp to replace her."

**L.     Ms. Timpson is now demoted to the position of file clerk.**

56.

Two days following Ms. Timpson's second time informing Mr. Cuffee that the Junior DA Program was operating out of compliance, and Mr. Cuffee walking away from Ms. Timpson, and Mr. Cuffee telling Ms. Timpson's colleagues "I am going to fire that bitch," and "She's outta here," and "I already got a temp to replace her"—Ms. Timpson contacts Cuffee's Superior, Dexter Bond (Deputy District Attorney of the Operations Division), asking him whether he knew about the PDP because the PDP paperwork had Mr. Bond's name on it. (See Ex. 6.)

57.

Ms. Timpson visited with Mr. Bond in his office, where she told him about, inter alia, (1) the Junior Da Program running out of compliance because children who lived and attended school out of state were participating against Program requirements and (2) her PDP and Cuffee telling people that he was going to fire Ms. Timpson; and (3) her belief he was misusing or had plans to misuse OJJDP funds. Mr. Bond responded by saying he was not surprised.

58.

On the same day Ms. Timpson met with Mr. Bond as described in this Complaint above, after the meeting, Ms. Timpson also sent a text message to Mr. Bond with an image of the PDP paperwork, showing Mr. Bond's name on the paperwork; Mr. Bond told Ms. Timpson that he knew nothing about Mr. Cuffee

putting Ms. Timpson on a PDP, despite Mr. Bond's name being on the paperwork, stating in a text message:" Wow. Make me a physical copy. **This is a problem." In this same text message exchange, Ms. Timpson stated the following:**

> "As it stands now, due to his actions I have multiple lawsuits period. EEOC, Defamation, Wrongful attempt to termination etc. He is out of pocket. I am certain if she knew, she wouldn't be ok with this."

Mr. Bond—an attorney by profession—responded thirteen minutes later by setting an appointment with DA Willis for that day, stating "**you are in a meeting with the DA at 3."** Note Ms. Timpson attempted to reach out to DA Willis regarding these concerns months prior and was ignored. (See Ex. 7)

59.

Now, just two days after Ms. Timpson's second time informing Mr. Cuffee that the Junior DA Program was operating out of compliance, and Mr. Cuffee walking away from Ms. Timpson, and Mr. Cuffee telling Ms. Timpson's colleagues "I am going to fire that bitch," and "She's outta here," and "I already got a temp to replace her," **and on the same day** as telling DA Willis' high level deputy (Dexter Bond) "as it stands now, due to his actions I have multiple lawsuits period. EEOC, Defamation, Wrongful attempt to termination etc. He is out of pocket. I am certain if she knew, she wouldn't be ok with this "—Ms. Timpson meets with DA Willis, who informs Ms. Timpson that she is being demoted to the position of file clerk.

60.

The meeting between DA Willis, Ms. Timpson, and Dexter Bond, in which Ms. Timpson was demoted from Director of Juvenile Diversion, a member of DA Willis' Executive Leadership Team to file clerk, lasted about five minutes, and Ms. Timpson barely spoke as DA Willis simply informed her of the demotion and for the first time in a complete 180° expressed her disappointment with Ms. Timpson's work. In fact, the meeting was so swift that Ms. Timpson had to write a follow up email just to get more details. (See Ex. 8.)

**M.   Ms. Timpson's position as file clerk dramatically changes her schedule and duties and implicated her known disability**

61.

In her new position as file clerk, Ms. Timpson had to change office buildings, moving to 136 Pryor Street from 395 Pryor Street; she had to be physically present in the new office building every business day versus previously being able to work from home (see Ex. 8, stating that Ms. Timpson could work from home until 2022 as Director in the Programs division, see Ex. 12, audio recording and See Ex. 15).

62.

Regarding her pay, Ms. Willis stated in writing that "I have not changed your salary although you are wise to know that your salary is much higher than I would pay someone in this new role." (See Ex. 8.)

63.

The demoted position and its correlated changes as described in this Complaint also had a negative effect on Ms. Timpson's documented disability, severe reactive airways disease and severe and persistent asthma both serious bronchial diseases.

**N.     Ms. Timpson's request for reasonable accommodation and her employer's inhuman response.**

64.

Foremost, Ms. Timpson's disability, severe reactive airways disease and asthma was well documented in her employment file at the time DA Willis took office; in fact, the former DA, Paul Howard, permitted Ms. Timpson to work outside the about 3 days a week, and even when required to be in the office, the DA office purchased an air purifier for her.

65.

That established, after being informed of the demotion and its correlated changes such as having to be physically present in the office five days a week, Ms. Timpson immediately informed DA Willis in an email of the impact these changes would have on her disability, and requested a reasonable accommodation, stating:

"Ms. Willis there are a few questions I had in my previous email that went unanswered and I would like to get some clarity on them. With the change in my job title, similarly, will my pay change as well. Also, you mentioned this change was a reasonable accommodation, I am now required to report to the office five days a week 8:30- 5. By definition this is contrary to a reasonable accommodation, as my previous schedule was 2/3 days in office, 2/3 days working from home. To re-iterate as a member of the Programs Division I was privy to working 2/3 days in office and 2/3 days from home each week until 2022. This schedule worked for me specifically because I have severe asthma, reactive airways disease and an acute mold allergy that triggers my other conditions. My asthma is so severe I have been a coma following an asthmatic episode. I am concerned with Georgia being documented as one of the key states with the lowest vaccination rates, the delta variant being on the rise with both infections and deaths. **Due to my asthma rendering me at high risk for contracting the virus and there being several confirmed cases in the office in recent days and weeks I am requesting an accommodation to return to my previous schedule until 2022 as stated in your most recent email on 07/08/21** Please advise." (See Ex. 8 for email.)

66.

DA Willis responded to Ms. Timpson's request to accommodate her disability by not only refusing to provide her with an accommodation but also—in a bizarre twist—essentially telling her that any further complaining would result in a negative performance evaluation; specifically, she stated the following:

"If you are unable to do your job for health reasons, please take care of your health and go out on FMLA. Otherwise, you will need to report as instructed. Please refrain from emailing me and follow the chain of command as you have been advised since the beginning of this administration in January…. Note this is ridiculous because you cannot do your current job from home thus you will certainly have difficulty keeping up with task and that will impact your evaluation."

67.

Notably, regarding DA Willis' contention that the demoted position, file clerk, cannot be worked from home, the persons working as file clerks prior to Ms. Timpson worked from home for nearly a year during the height of the Covid- 19

Pandemic, and even Ms. Timpson supervisor, Valencia Younger stated that the job could easily be done from home.

68.

Also, DA Willis never took any steps to discuss and explore any reasonable accommodations for Ms. Timpson after her request for said accommodation, and never directed anyone to take any steps to discuss and explore reasonable accommodations for Ms. Timpson's disability, as evidenced by the fact that no one ever approached Ms. Timpson to discuss reasonable accommodations for her disability.

69.

Also, regarding DA Willis' statement that "if you are unable to do your job for health reasons, please take care of your health and go out on FMLA" is contrary to, and undermines, the American Disabilities Act requirement to explore and discuss accommodations for disabled persons, i.e., you do not tell a disabled person who is seeking an accommodation, go on FMLA or stop talking about the issue.

70.

In relation to the asserted fact that no one ever approached Ms. Timpson to discuss and explore reasonable accommodations for her, after she request said accommodation, copied on the email communication is Kyra Banks, who is the Chief of Staff-Personnel, and the Chief of Personnel has never approached Ms.

Timpson about a reasonable accommodation.

71.

Also, no one ever challenged Ms. Timpson as to whether she had a disability, nor did anyone ever request Ms. Timpson to provide paperwork demonstrating that she had a disability, a reality that more likely than not has to do with the fact that her disability had already been documented in her employment file (See Ex. 21)

1. **DA Willis ensures Ms. Timpson cannot work from home.**

72.

Within two hours of DA Willis essentially telling Ms. Timpson to either go out on FMLA or stop talking about her disability, and refusing to discuss/ explore a reasonable accommodation for Ms. Timpson's disability, DA Willis instructed IT to take Ms. Timpson's laptop, a heavy handed, heartless tactic designed to ensure that Ms. Timpson had to come to the office every day to perform her job—mindful that at the time Ms. Timpson's laptop was taken, every person who performed the specific tasks that Ms. Timpson performed as a file clerk had a laptop. (See Ex. 14).

O. **The Employer never provides a reasonable accommodation nor meets with Ms. Timpson to discuss/explore options.**

73.

From the time Ms. Timpson requested a reasonable accommodation through her termination, her employer, never met with her to discuss/explore reasonable accommodations despite knowing she suffered from a disability and had requested said accommodations. (See Ex. 18 multiple requests for reasonable

accommodations).

74.

During the time Ms. Timpson requested a reasonable accommodation through her termination, Ms. Timpson made several requests for reasonable accommodations due to her disability including on August 2, 2021, December 7, 2021, December 28, 2021, and January 12, 2022, less than 48 hours before she was terminated, yet she could not even get a sit down to discuss/explore accommodating options.

75.

During the time Ms. Timpson requested a reasonable accommodation through her termination, Ms. Timpson filed a complaint with the Fulton County's Department of Diversity and Civil Rights Compliance.

**P.    Ms. Timpson is terminated within 8 days of filing a complaint with Fulton County's Department of Diversity and Civil Rights Compliance and within 30 days of filing a charge of discrimination with the EEOC.**

76.

During the time Ms. Timpson requested a reasonable accommodation through her termination, Ms. Timpson filed a charge of discrimination with the EEOC, and it was received by the Fulton County District Attorney's Office on December 18, 2021; she was terminated twenty-seven days later.

77.

During the time Ms. Timpson requested a reasonable accommodation through her termination, Ms. Timpson filed a charge of discrimination with the Fulton County's Department of Diversity and Civil Rights Compliance on January 6, 2022; she was terminated eight days later.

78.

DA Fani Willis made the decision to terminate Ms. Timpson and knew about both EEOC charge of discrimination and the complaint of discrimination made to the DCRC prior to making said decision.

**Q.   Ms. Timpson is terminated within 45 days of reporting directly with DA Willis about being out of compliance with grant programs and being discriminated against based on reporting being out of compliance with funding programs including misuse of funds.**

79.

Foremost, on November 19, 2021, Ms. Timpson met with DA Willis and during this conversation Ms. Timpson told DA Willis that she told Mr. Cuffee that he could not do certain things with grant money because spending money in the way Cuffee wanted to spend money would be out of compliance with the requirements of the OJJDP funding. (See Ex. 13).

80.

On November 19, 2021, Ms. Timpson met with DA Willis and during this conversation Ms. Timpson reported again that Mr. Cuffee was out of compliance

with Junior DA funding requirements because there were kids from out of the county. (See. Ex. 11, audio recording). "I respect that is your assessment…and I am not saying that your assessment is wrong, I want you to really listen to the words that I am saying."

81.

On December 7, 2021, Ms. Timpson sent Fani Willis an email that stated the following relevant statements:

> "From the onset of this situation, I attempted to make you aware of what I saw to be a dangerous situation, where funds were being misappropriated, and I was being thrown under the bus as the "fall guy." Since then, I have been bullied, discriminated against for my look, my protected background, and beliefs, as well as a lifelong severe and pervasive disability that I have been intubated in a coma as a result twice in my life. I have been humiliated and retaliated against for doing the right thing trying to protect your administration from scandal and advocate for the youth I was charged with working on behalf of."

82.

In that same email dated December 7, 2021, Ms. Timpson asked DA Willis to "do the right thing" while also outlining numerous issues including the emotional and physical health effects that have resulted from being discriminated and retaliated against. (See Ex. 9.) DA Willis essentially responded by terminating Ms. Timpson 34 days later.

83.

After receiving the December 7, 2021, letter, no one, including DA Willis attempted to discuss misuse use of funds that Ms. Timpson mentioned in said letter,

or discuss her health issues or discuss other job-related issues such as Ms. Timpson's references to discrimination/retaliation. Again, she was terminated a within a mere 34 days after DA Willis read the letter.

84.

Notably, this same email dated December 7, 2021—which references misuse funds, retaliation, and discrimination, inter alia--was forwarded directly to a lawyer for the Fulton County Legal Department on that same date (December 7, 2021)—mindful that Ms. Timpson was fired within 34 days of Fulton's lawyer reading said email.

**R.    Ms. Timpson is terminated within 30 minutes of meeting with the Fulton County Department of Diversity and Civil Rights Compliance.**

85.

On the morning of January 14, 2022, Ms. Timpson met with her senior supervisor Ms. Ramona Toole to discuss her grievances. Ms. Timpson hoped to seek guidance as she had recently returned from two weeks of sick leave after being diagnosed with severe asthmatic bronchitis and an upper respiratory infection to which she was prescribed to telework by her multiple physicians yet again including her pulmonary specialist.

86.

Ms. Timpson asked Ms. Toole who is an Attorney by trade for her confidentially in this matter as a "barred attorney" to which Ms. Toole adamantly

agreed to stating "of course, the only person I share everything with is my mom, I tell her everything but I'm not even sharing this with her." During Ms. Timpson's meeting with Ms. Toole, Ms. Timpson shared both confidential personal and medical information showing her documents from her phone believing this meeting would remain confidential. Despite Ms. Timpson's request for confidentiality from her supervisor, Ms. Toole who is a barred attorney, Ms. Timpson was recorded by Ms. Toole. (See Ex. 17).

87.

Later that day Ms. Timpson met with the Director of the Fulton County Department of Diversity and Civil Rights Compliance at her request, to discuss the most recent complaint that she filed against DA Willis regarding alleged disability discrimination and, also to provide the Director with a copy of her disability documents, the same documents Ms. Timpson showed Ms. Toole earlier that morning. These documents had been requested by the Director of the DCRC, while complying with this request Ms. Timpson sent said medical documents to her work phone so she could attach the documents to the DCRC requested email.

88.

Significantly, during the meeting with the Director, Ms. Timpson received a meeting invite from DA Willis's office, scheduling a meeting between Ms. Timpson, DA Willis, and Dexter Bond to occur four days later, on January 18, 2022.

89.

Once she received the subject meeting invite from DA Willis, Ms. Timpson told the Director of the Fulton County Department of Diversity and Civil Rights Compliance that she did not feel comfortable meeting with DA Willis and Mr. Bond alone; in response, the Director stated she would reach out to the HR Department to make sure that an HR representative was present at the meeting as an advocate.

90.

Within 20 minutes of leaving her meeting with the Director of the Fulton County Department of Diversity and Civil Rights Compliance—and receiving a meeting request from DA Willis, to meet four days later, on January 18, 2022—Ms. Timpson was terminated and escorted, by approximately seven investigators out of the building (See Ex. 10).

91.

Following Ms. Timpson's Termination, Leadership in the Fulton County Department of Diversity and Civil Rights Compliance Told Ms. Timpson, regarding this inescapable temporal connection, in the timing of her termination  Ms. Cuthrell, the DCRC Administrator, stated "[i]t is interesting from anyone's viewpoint that ummm, you know in the termination occurring, I think that the timing, that can't be denied, that it happened the same day that you met with Ms. Thomas [head of the DCRC] and Ms. Toole earlier…." (See Ex. 19 audio recording of Ms. Cuthrell)

92.

Ms. Niger Thomas Director of the DCRC Assured Ms. Timpson and assured her she without question had engaged in protected activity saying "I do think the notification letter does two powerful things, for you. One of the things, it substantiates is that you have engaged in protected activity, without question. That's not a she says she says or a he says he says." (See Ex. 20, audio recording of Ms. Niger Thomas) Ms. Timpson Unequivocally engaged in protected activity and was retaliated against for months and ultimately terminated while engaging in said activity.

## COUNT I
## VIOLATION OF THE AMERICAN DISABILITIES ACT
(*Against Defendants*)

93.

Plaintiff now fully incorporates the facts and assertions found in paragraphs 1-92, and any other facts this Court deems relevant, as if fully stated herein to support all allegations made in this Court.

94.

Based on the facts incorporated to support this Count, Defendants violated Ms. Timpson's rights under the Americans Disabilities Act.

95.

Because Defendants violated Ms. Timpson's ADA rights, she is entitled to all damages permitted by controlling law.

## COUNT II
## RETALIATION IN VIOLATION AMERICAN DISABILITYIES ACT,
(*Against Defendants*)

96.

Plaintiff now fully incorporates the facts and assertions found in paragraphs 1-95, and any other facts this Court deems relevant, as if fully stated herein to support all allegations made in this Court.

97.

Based on the facts incorporated to support this Count retaliated against Ms. Timpson in violation of her rights under the American Disabilities Act.

98.

Based on the facts incorporated to support this Count because Defendants violated Ms. Timpson's rights under the ADA by retaliating against her in violation of her ADA rights, Ms. Timpson is entitled to all permissible damages under governing law.

## COUNT III
## PUNITIVE DAMAGES,
(*Against Defendant Fani Willis*)

99.

Plaintiff now fully incorporates the facts and assertions found in paragraphs 1-98, and any other facts this Court deems relevant, as if fully stated herein to support all allegations made in this Court.

100.

Based on the facts incorporated to support this Count, Defendants willfully/intentionally, and in reckless disregard, violated Ms. Timpson's rights under the ADA. As such, Ms. Timpson is entitled to punitive damages.

**COUNT IV**
**SPECIAL DAMAGES**
(*Against Defendants*)

101.

Plaintiff now fully incorporates the facts and assertions found in paragraphs 1-101, and any other facts this Court deems relevant, as if fully stated herein to support all allegations made in this Court.

102.

Based on the facts incorporated to support this Count, Ms. Timpson is entitled to special damages in an exact amount that is no less than one hundred thousand dollars.

**PRAYER FOR RELIEF**

**WHEREFORE**, Ms. Timpson prays for a trial by jury of twelve and judgment against Defendant as follows:

      a.    The process issue and service be had on Defendants;

      b.    That judgment be granted in favor of Plaintiff against Defendants, jointly and severally, for the injuries of

Plaintiff;

c.      That Plaintiff recover compensatory damages including pain

and suffering, lost income and future lost income, and other expenses

in an amount to be determined at trial;

d.      Plaintiff be awarded special damages for lost earnings and

reduction in earning capacity from Defendants;

e.      That Plaintiff recover all costs of this litigation and recover

attorneys fees;

f.      That a jury trial be had on all issues so triable;

g.      Plaintiff have Judgment against Defendants for

punitive damages; and

h.      That Plaintiff receives such other and further relief as the Court

deems just and proper.

Respectfully submitted this 28th day of December 2022,

                                        /s/DAVID BETTS
                                        David Betts
                                        Ga Bar No. 055850

**BETTS & ASSOCIATES**
44 Broad Street NW, Suite 200
Atlanta, GA 30303
P: 404-577-8888 / F: 404-577-0080
davidbetts@bettslaw.net